AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Central District of California  ▢

```
FILED
CLERK, U.S. DISTRICT COURT

5/1/2023

CENTRAL DISTRICT OF CALIFORNIA
BY:          D.C.          DEPUTY
```

| United States of America | ) | |
| v. | ) | |
| Julian Ruiz-Ochoa | ) | Case No. |
| | ) | 5:23-MJ-00202 |
| | ) | |
| | ) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___March 30, 2023___ in the county of ___Riverside___ in the ___Central___ District of ___California___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) | Possession with Intent to Distribute 50 Grams or More of Methamphetamine |
| 18 U.S.C. § 924(c)(1) | Possession of a Firearm in furtherance of a Drug Trafficking Crime |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

/s/ Pursuant to Fed. R. Crim. P. 4.1

*Complainant's signature*

Dennis Schupp, Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: ___5/1/23___

*Judge's signature*

City and state: ___Anaheim~~Riverside,~~ California___

Hon. Shashi H. Kewalramani, Magistrate Judge

*Printed name and title*

*AUSA:* Peter Dahlquist

## **AFFIDAVIT**

I, Dennis Schupp, being duly sworn, declare and state as follows:

### **I.  PURPOSE OF AFFIDAVIT**

1.   This affidavit is made in support of a criminal complaint and arrest warrants against Juan Luis BOTELLO-HERRERA ("J. BOTELLO"), Israel BOTELLO-HERRERA ("I. BOTELLO"), and Bertin SEGUNDO-PIEDRA ("SEGUNDO") for a violation of 21 U.S.C. § 846 (Conspiracy and Attempt to Distribute 50 Grams or More of Methamphetamine in Violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii)) and with respect to Julian RUIZ-OCHOA ("RUIZ"), a criminal complaint and arrest warrant a violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii) (Possession with Intent to Distribute 50 Grams or More of Methamphetamine) and 18 U.S.C. § 924(c)(1) (Possession of a Firearm in furtherance of a Drug Trafficking Crime).

2.   This affidavit is also made in support of an application for a warrant to search the following digital devices in DEA custody in Riverside, California, (collectively, the "SUBJECT DEVICES") as described more fully in Attachment A:

        a.   One black iPhone without a case and with phone number 951-567-0086 ("SUBJECT DEVICE 1");

        b.   One black Samsung phone without a case and with phone number 915-321-2625 ("SUBJECT DEVICE 2");

        c.   One white iPhone with a grey case ("SUBJECT DEVICE 3");

      d.   One black Samsung phone with a dark blue case ("SUBJECT DEVICE 4");

      e.   One black Samsung phone with a black case ("SUBJECT DEVICE 5");

      f.   One black Samsung phone with a transparent brown case ("SUBJECT DEVICE 6");

      g.   One black iPhone with a clear case ("SUBJECT DEVICE 7"); and

      h.   One black Samsung phone with a black case ("SUBJECT DEVICE 8").

3.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (Possession with Intent to Distribute Controlled Substance and Manufacture of Controlled Substance); 841(c)(1) (Possession of Listed Chemical with Intent to Manufacture a Controlled Substance); and 846 (Conspiracy and Attempt to Distribute Controlled Substances); 18 U.S.C. §§ 922(g) (Prohibited Person in Possession of Ammunition); and 924(c) (Possession of a Firearm in Furtherance of a Drug Trafficking Crime) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested arrest warrants

and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. **BACKGROUND OF AFFIANT**

5.    I am a DEA Special Agent and have been a DEA Special Agent since September of 2008.  I am currently assigned to the Riverside District Office in California.  I have received approximately 20 weeks of training at the DEA Academy in Quantico, Virginia regarding the techniques of major narcotics traffickers.  I have specialized training involving the use, possession, packaging, manufacturing, sales, concealment, transportation of various controlled substances, money laundering techniques and conspiracy investigations. Additionally, I have attended special training in wire and electronic interceptions and the use of wire and electronic interception equipment and am certified by the California State Attorney General's Office in the practical, technical and legal aspects of court ordered wiretaps per Penal Code Section 629 et seq.

6.    In 2009, I completed the Basic Clandestine Laboratory Course in Quantico, Virginia, administered by the DEA Office of Training. The course consisted of approximately 40 hours of lecture and practical applications training, and through the use of actual laboratory equipment, digital media, homemade devices, chemical containers, chemicals and simulated chemicals, the

instructors demonstrated, explained and discussed the various manners, methods and means by which controlled substances are manufactured in clandestine laboratories. I also received instruction on and practical training in the recognition, investigation, and safe handling of Clandestine Methamphetamine laboratories as taught by the DEA.

7.   In 2010, I completed both the Basic and Advanced Concealed Compartment Courses sponsored by the DEA Concealed Trap Initiative.  These courses consisted of approximately 24 hours of lecture and hands on training regarding various common concealment methods used by criminals to conceal drugs, illicit proceeds, and weapons inside of vehicles. I received instruction in the detection and operation of several types of compartments and gun hides in common areas including the dashboard, airbag compartment, rear seatbacks, rear quarter panels, floor, ceiling, engine compartment, and undercarriage.  Approximately 8 hours of this course consisted of practical applications exercises using the aid of several operational vehicles containing the above listed compartments and concealment methods.

8.   From September 2012 through August 2015, I was assigned to the San Bernardino County Sheriff's Department Inland Regional Narcotics Enforcement Team as a federal liaison in support of large-scale narcotics investigations.  While assigned to IRNET, I participated in hundreds of narcotics investigations ranging from surveillance and informant-driven cases to complex conspiracy wiretap cases, resulting in the

cumulative seizures of thousands of pounds of narcotics to
include cocaine, methamphetamine, heroin, and marijuana, as well
as several million dollars of illicit proceeds.

9.    From January 2017 to January 2022, I was assigned to
DEA foreign offices located in Udon Thani and Chiang Mai,
Thailand.  During this assignment, I participated in regional
joint investigations with Thai law enforcement agencies and
other DEA foreign offices targeting large-scale drug trafficking
organizations smuggling bulk narcotics shipments in Thailand and
neighboring countries.  I also planned and coordinated large
training and equipment donation events for Thai law enforcement
counterparts to include firearms training, Thai National License
Plate Reader Techniques, and Social Media and Open Source
Investigative Techniques, as supported by the US State
Department.

10.   During employment with the DEA, I have participated in
narcotics investigations as both a case agent and in a
supportive role, leading to the arrests of multiple drug
traffickers as a result of these investigations.  I have
participated in surveillance operations across Southern
California and have assisted in the executions of multiple
federal and California State search warrants and arrest
warrants.  I have spoken with informants, suspects, and other
experienced narcotics investigators concerning the methods of
sales, packaging, transportation and manufacturing of narcotics
and learned that subjects involved in the possession, sales and
trafficking of narcotics often hide the substances and

paraphernalia in their homes, on their person, and in their vehicles.  Individuals involved in narcotics distribution possess business ledgers pertaining to narcotic transactions and other documents tending to identify other persons involved. These documents are often found in their homes, on their person, and in their vehicles, and in their personal computers.  It has also been my experience that persons involved in narcotic trafficking use false names and addresses to hide their identity and their connection with the residences and/or businesses they often possess or distribute the controlled substance from.  They also use fictitious names and addresses when subscribing to cellular phone services, operate vehicles that are registered in names other than their own, and use other persons for intermediaries to conduct their illegal activities.  It has also been my experience that those involved with illicit narcotic transactions will often maintain weapons, including but not limited to firearms and explosive devices, in order to protect their illicit narcotic transactions from other narcotics traffickers and sometimes to use against law enforcement officials.

11.  I have investigated violations of Title 21, United States Code, 841(a)(1), 843(b), 846, 952(a) and 963, and Title 18, United States Code 1952, 1956, and 1957, as well as in violation of corresponding California laws under the respective California Health and Safety (H&S) Code sections.  As a DEA Agent, I primarily investigate large-scale narcotics traffickers and money laundering organizations.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

12.  On March 30, 2023, investigators arrested RUIZ in
possession of approximately 49 kilograms (108 pounds) of
methamphetamine that he carried in Lowe's boxes and a loaded,
un-serialized 9mm handgun.[1]  The arrest was the result of planned
buy/bust operation where a DEA confidential source ("CS")
ordered 50 kilograms of methamphetamine through a
methamphetamine broker and agreed to pick up the methamphetamine
in a hotel parking lot in Moreno Valley, California.[2]  Leading up
to the deal, the CS communicated with a broker who helped
coordinate the deal, and the CS also communicated with RUIZ
directly.

13.  During RUIZ's arrest, agents found a 9mm handgun
concealed in RUIZ's waistband.  Agents seized two cell phones
from his person, SUBJECT DEVICE 1 and SUBJECT DEVICE 2.

---

[1] Typically referred to as a "Ghost Gun."  Ghost Guns are
unregulated, un-serialized firearms that can be purchased and
assembled by anyone, including convicted felons and other
prohibited persons, without a background check.

[2] The CS was established by the DEA Pensacola Resident
Office ("PRO") in February 2023 as a defendant CS.  Throughout
his/her tenure as a confidential source, the CS has provided
information that has been corroborated and proven to be
accurate.  In March 2023 the CS conducted two controlled
purchases of automatic firearms in Florida in furtherance of a
joint DEA/ATF case, and on March 29, 2023 the CS assisted DEA
PRO and RDO in a buy/bust operation in CA resulting in the
seizure of two kilograms of suspected fentanyl and two arrests.
PRO investigators have had no control issues with the CS.  The
CS has the following misdemeanor convictions: 2002, Disorderly
Conduct – sentenced to probation; 2003, Disorderly Conduct –
sentenced to probation; 2003, Disorderly Conduct – sentenced to
probation; 2005, Trespassing – sentenced to probation. The CS
has the following felony conviction: 2005, Battery, False
Imprisonment, Carjacking with Firearm or Weapon – sentenced to
10 years state prison.

14.   Officers searched the truck RUIZ drove to the deal, and in the cab of the truck, investigators found a service termination bill from Southern California Edison addressed to "Steve Lopez" at 45950 Cisco Road, Newberry Springs, California (the "Newberry Springs Property") with a closing energy bill of over $13,000.  DEA investigators had also observed GPS phone pings data of RUIZ's phone with number 951-567-0086, the number associated with SUBJECT DEVICE 1, for several days consistently in Newberry Springs, and observed it depart from Newberry Springs and travel to Moreno Valley on the date of the buy/bust. Based on this information, agents concluded the Newberry Springs Property was likely a methamphetamine lab.

15.   Upon concluding the Newberry Springs Property was likely a methamphetamine lab, investigators quickly drove to the Newberry Springs Property to surveil it.  Shortly after investigators arrived, investigators saw a van and a truck leave the property within minutes of each other.  As the truck left, investigators saw a man later identified as SEGUNDO get out of the truck and secure a padlock on the gate to the Newberry Springs Property.

16.   SBCSD stopped, and as discussed below, searched both vehicles.  In the van, investigators found five Lowe's boxes— just like the boxes RUIZ brought to the meeting with the CS-containing a total of about 200 pounds of suspected methamphetamine.  J. BOTELLO was the sole occupant of the van. He was also the owner of the truck DIAZ drove to the buy/bust location where officers found the Southern California Edison

energy bill for the Newberry Springs Property.  In the truck
that was leaving the Newberry Springs Property, officers found
drums of acetone, a precursor to methamphetamine production.  I.
BOTELLO was driving and SEGUNDO was the passenger.  I. BOTELLO
told officers they would find more evidence at the Newberry
Springs Property.  SEGUNDO said that he was just visiting the
Newberry Springs Property and declined to make any other
statement, but, as detailed below, he locked the gate to the
Newberry Springs Property as he and I. BOTELLO left, and a
criminal history check for SEGUNDO revealed that he had a 2020
arrest for manufacturing a controlled substance.

17.  Investigators executed a California state search
warrant at the Newberry Springs Property and discovered a large
clandestine methamphetamine conversion lab with large amounts of
unfinished methamphetamine in various stages of production which
investigators estimate could have been used to produce
approximately 3,448 pounds of methamphetamine.  Investigators
also located and seized about 55 pounds of finished
methamphetamine from the Newberry Springs Property.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

18.  Based on my review of law enforcement reports,
conversations with other law enforcement agents, and my own
knowledge of the investigation, I am aware of the following:

**A.  The CS Arranges to Buy 50 Kilograms of Methamphetamine
from RUIZ**

19.  In early March 2023, DEA Task Force Officers ("TFOs")
assigned to the Pensacola, Florida office contacted me and

requested assistance investigating the drug trafficking
activities of Michael WRIGHT, who used the moniker "Cashboy."
According to information provided to Pensacola TFO Jonathon Hand
by the CS, WRIGHT has sold large quantities of methamphetamine
to the CS at the Holiday Inn Express in Moreno Valley,
California, located on Day Street south of the 60 Freeway.  The
CS provided a phone number for WRIGHT of 909-550-7974 (the "7974
number").

20.  On March 10, 2023, the CS placed a recorded phone call
to WRIGHT at the 7974 number to discuss setting up a large
narcotics purchase the last week of March 2023.  During the
recorded call, the CS told WRIGHT he/she is "trying to get a big
one in" and the asks for "40 wholes."  The CS then discusses
with WRIGHT pricing for methamphetamine and talks about a price
of "two grand a brick."  The CS stated again that he/she will be
out there (in California) at the end of the month (March), and
WRIGHT stated that he needed to discuss the sale with a third
party and would contact the CS later.  Based on my training,
experience, and participation in previous narcotics
investigations, "trying to get a big one in" means the CS wants
to place a large methamphetamine order with WRIGHT; "two grand a
brick" means a potential pricing of $2,000 per kilogram of
methamphetamine; and the term "wholes" used by the CS is a
weight term meaning a kilogram-quantity rather than the more
common pound-quantity.  In this case, the CS requested 40
kilograms of methamphetamine.

21.   On March 22, 2023, TFO Hand contacted me and stated that on March 21, 2023, the CS called WRIGHT and WRIGHT told the CS that he was having some personal family problems and would not be able to meet with the CS at the end of the month. However, WRIGHT told the CS to contact the methamphetamine supplier directly to set up the sale.  Following the call with WRIGHT, the CS provided to TFO Hand phone number 951-567-0086, the phone number for SUBJECT DEVICE 1, which according to the CS, belongs to a Hispanic male who he knew only as "Amigo" (later identified as RUIZ).  The CS told TFO Hand that he/she had met "Amigo" before in Moreno Valley, California with WRIGHT, and that "Amigo" had supplied methamphetamine to the CS as brokered by WRIGHT and that WRIGHT had always previously been present during the deals to receive a commission on the sale.

22.   The CS further arranged this transaction to take place at 2:00 p.m. on Thursday, March 30, 2023, in Moreno Valley, with the exact place to be determined, and agreed that the amount would be for 50 kilograms of methamphetamine (approximately 110 pounds) instead of 40 kilograms.  This call was not recorded.

23.   Upon receiving this information, I applied for a California state search warrant authorizing GPS ping locations of WRIGHT's phone, the 7974 number, and RUIZ's phone, the number for SUBJECT DEVICE 1, and began monitoring those phones' locations leading up to the planned buy/bust operation on March 30, 2023.[3]  I observed the GPS ping locations of SUBJECT DEVICE 1

---

[3] Search Warrant Number RI040320231 signed by Riverside County Judge David Gunn on March 24, 2023.

consistently in the area of Newberry Springs, California for several days leading up the transaction on March 30, 2023.  I also reviewed the pings from SUBJECT DEVICE 1 from the late-night hours of March 29, 2023 and observed them in Newberry Springs throughout the morning of March 30, 2023.

**B.  Buy/Bust on March 30, 2023 and Arrest of RUIZ with SUBJECT DEVICE 1 and SUBJECT DEVICE 2**

24.  On March 30, 2023, at approximately 12:30 p.m., DEA agents and local investigators set up surveillance near the Fairfield Inn, Moreno Valley in preparation for the buy/bust operation.  A short time later, the CS received a Snapchat message from WRIGHT that RUIZ would arrive in Moreno Valley at about 1:20 p.m.  TFO Hand was with the CS when the Snapchat message arrived and saw it.

25.  At approximately 1:00 p.m., I received a GPS ping location of RUIZ's phone, SUBJECT DEVICE 1, near the I-15/I-40 freeway split in Barstow, California.  I monitored ping locations of SUBJECT DEVICE 1 throughout the afternoon and observed the GPS locations travel south into Riverside and into Moreno Valley.

26.  At approximately 2:30 p.m., the CS received a call from RUIZ from phone number 915-321-2625, the number for SUBJECT DEVICE 2.[4]  The CS gave RUIZ the meet location of Fairfield Inn, and RUIZ told the CS he was about five minutes from the exit.

_____

[4] At the time of RUIZ's arrest, agents seized SUBJECT DEVICE 2 from his person.  Additionally, the CS told TFO Hand after this call that he/she recognized the user of phone 2629 to be "Amigo" (RUIZ) by his voice, as he/she had met "Amigo" (RUIZ) at previous drug transactions.

27.   At approximately 2:53 p.m., agents saw a black Ford F-150 (driven by a man later identified as RUIZ) circle the Fairfield Inn lot and park in a neighboring parking lot. Records checks revealed that J. BOTELLO was the registered owner of the truck.[5]  A short time later, at the direction of investigators, the CS drove from a neutral location to the Fairfield Inn parking lot and placed recorded calls to WRIGHT at the 7974 number.  During that call, WRIGHT told the CS that RUIZ would probably need help carrying "it up."  Based on my training and experience, this meant RUIZ needed assistance carrying the methamphetamine because it would be difficult for one person to carry 50 kilograms of methamphetamine.

28.   The CS then placed a recorded call to RUIZ using the number for SUBJECT DEVICE 2.  During the call, he/she directed RUIZ to the CS's vehicle for the meeting.  During the call with RUIZ, the CS asked why RUIZ was taking a particular route to the Fairfield Inn, requiring U-turns.  RUIZ replied that whenever he "has stuff" he has to "respect the fu**in rules."  Based on my training and experience, RUIZ's statements demonstrate his knowledge that he was transporting narcotics and was engaging in countersurveillance techniques as a precaution.

29.   While these calls were being placed, investigators saw RUIZ drive from the neighboring lot out to Day Street and to the

---

[5] J. BOTELLO was arrested later that day leaving the Newberry Springs Property driving a van filed with boxes of methamphetamine.  The boxes of methamphetamine from the van matched the boxes of methamphetamine RUIZ delivered to the CS.

entrance on the south side of Fairfield Inn, eventually meeting with the CS's vehicle on the north side of Fairfield Inn.

30.   After RUIZ arrived in the parking lot of the Fairfield Inn, the CS contacted RUIZ at the window of RUIZ's F-150.  The CS then retrieved a large cardboard Lowe's box from the back seat of the F-150.  RUIZ retrieved a second Lowe's box from the same area and followed the CS on foot toward the hotel, at which time DEA personnel, wearing clearly visibly police markings and giving loud verbal commands, contacted RUIZ and placed him under arrest.  During RUIZ's arrest, agents found a loaded un-serialized 9mm handgun concealed in RUIZ's waistband near the small of his back.  On RUIZ's person, agents also found SUBJECT DEVICE 1 and SUBJECT DEVICE 2.  Finally, agents found RUIZ's California driver's license in RUIZ's wallet.[6]  While examining the handgun, agents discovered it loaded with three rounds of ammunition.  In the Lowe's boxes, agents found approximately 49 kilograms of methamphetamine packaged in Ziploc bags.  The methamphetamine was packaged in the same types of boxes and the same types of Ziploc bags as additional finished methamphetamine officers recovered at the Newberry Springs Property as later that afternoon.

31.   In the cab of the F-150, investigators found a green ledger book with what appeared to be "pay/owe" information in

---

[6] USPI Nick Lamberti later placed a blocked call to phone number 951-567-0086 and noted that the smaller of the two phones rang, identifying that number as the number corresponding to SUBJECT DEVICE 1.  USPI Lamberti then placed a blocked call to phone number 915-321-2625 and noted that the larger of the two phones rang, identifying that number as the number corresponding to SUBJECT DEVICE 2.

it.  Based on my training and experience, drug traffickers keep records of previous drug transaction payment amounts received and amounts owed.  Specifically, this ledger book contained the same terminology in it as two other ledgers seized at the Newberry Springs Property later that day, to include operating expenses incurred and payment/drug load delivery information.

32.  Investigators also found in the cab of the truck a service termination bill from Southern California Edison dated February 14, 2023.  The bill was addressed to "Steve Lopez" at the Newberry Springs Property with a closing energy bill of $13,634.36.  I searched this address in Google Maps and observed its location was close to GPS ping locations of SUBJECT DEVICE 1 in the days and morning leading up to the buy/bust on March 30, 2023.  Based on the very high energy bill for a remote area within San Bernardino, and based on the GPS ping information that showed RUIZ came from that same area before arriving at the Fairfield Inn with over 100 pounds of methamphetamine, investigators concluded that the Newberry Springs Property was likely being used as a methamphetamine lab.

33.  After discovering the energy bill for the Newberry Springs Property and connecting that area to the area where RUIZ had come from just before the 100-pound seizure, investigators left for the Fairfield Inn and traveled to Newberry Springs Property for follow-up investigation.  Investigators wanted to arrive at the Newberry Springs Property as quicky as they could because they suspected that co-conspirators that might be at the property would flee or destroy evidence if they learned

something went wrong with RUIZ's 100-pound delivery.  When
dealers traffic in such large quantities, it is not unusual for
co-conspirators to have a protocol for confirming that a deal
was completed.  Additionally, investigators knew that at least
one other person, WRIGHT, was involved in the deal and would be
seeking an update and a share of the proceeds from the
transaction.

C.   **Search Warrant and Meth Lab Processing at 45950 Cisco
     Road, Newberry Springs and Arrests of J. BOTELLO, I.
     BOTELLO, and SEGUNDO**

34.  At approximately 5:30 p.m., investigators began
surveillance at the Newberry Springs Property.  Within minutes
of arriving, investigators saw two vehicles depart the location
within minutes of each other.  The first vehicle that left the
Newberry Springs Property was a white Dodge Transit van.  As the
van was departing, the driver of the van got out of the van and
checked the mailbox for the Newberry Springs Property.  Local
investigators stopped the van for a violation California Vehicle
Code section 26708(a)(1), a window tint violation, and spoke to
its sole occupant, J. BOTELLO.  J. BOTELLO was the registered
owner of the F-150 that RUIZ used to transport the 100 pounds of
methamphetamine from Newberry Springs to the Fairfield Inn in
Moreno Valley.  In that truck, the officers had also found the
Southern California Edison bill closing energy bill of
$13,634.36.  J. BOTELLO said he has lived at Newberry Springs
Property for about 15 days.

35.  One of the investigators asked if they could search
the van, and J. BOTELLO agreed that officers could search the

van, but J. BOTELLO did not want to sign a written consent form
or open the back of the van.  Due to the heavy tint on the van's
back windows, officers performed a safety sweep on the van by
opening the van's back doors to check to see if any additional
people were in the in van.  When the officers opened the back
door to the van, they saw five large cardboard Lowe's boxes—the
same type of boxes seized earlier that day that contained the
100 pounds of methamphetamine.  Investigators transported J.
BOTELLO and the van to the Newberry Springs Property and applied
for a state search warrant to search the Newberry Springs
Property.

36.  Ultimately, officers searched the van and found
approximately 200 pounds of suspected methamphetamine.  The
methamphetamine was packaged Ziploc bags within Lowe's boxes.

37.  A few minutes after stopping the van, officers stopped
the second vehicle leaving the Newberry Springs Property, a
black F-150, and detained its two occupants, I. BOTELLO, the
driver, and SEGUNDO, the passenger.  During the stop,
investigators could see several large drums of acetone in back
seat of the truck.[7]  Prior to departing the residence,
investigators saw the passenger in the truck, SEGUNDO, get out
of the truck and place a padlock on the vehicle gate of the
Newberry Springs Property.  Based on my training and experience,
drug traffickers and stash house operators routinely leave
driveway gates closed and secured, even when at home, and secure

---

[7] Acetone is a common chemical precursor used in the
production of methamphetamine.

them when leaving the property as a means of protecting illegal items inside their residences.

38.   During a field interview, I. BOTELLO both stated they lived at the Newberry Springs Property for a few weeks.  I. BOTELLO stated that there was more of what was in the van (interviewers understand him to be referring to methamphetamine) in the residence.

39.   During the encounters at the Newberry Springs Property, investigators seized SUBJECT DEVICE 3, SUBJECT DEVICE 4, SUBJECT DEVICE 5, SUBJECT DEVICE 6, SUBJECT DEVICE 7, and SUBJECT DEVICE 8 from the persons J. BOTELLO, SEGUNDO, and I. BOTELLO.  Due to the pace of events that evening, however, investigators were not able to determine specifically which phones belonged to which person.  DEA agents seized the phones from local investigators to apply for warrants to search the SUBJECT DEVICES.

40.   At approximately 6:20 p.m., investigators executed a state search warrant at the Newberry Springs Property and discovered a large methamphetamine conversion lab.[8]  The lab consisted of the garage, adjoining storage room, and the majority of the inside of the residence.  Only two bedrooms and the kitchen were not part of the lab.[9]  DEA agents located an

---

[8] Search Warrant Number 000111137, signed by San Bernardino County Judge James Hosking on March 30, 2023.

[9] Due to the majority of the residence being used to produce methamphetamine, there is no way for a resident of either of the two bedrooms to live in the bedroom without knowledge of the methamphetamine lab in the rest of the house. For example, if one were to walk from a bedroom to the kitchen, he would have to walk through a portion of the lab.

estimated 500 5-gallon barrels of acetone, a common chemical
precursor used in the production of methamphetamine, in the
storage area.[10]  In the same storage area, agents found several
dozen large plastic totes and 10-gallon Igloo containers
containing meth-oil and other unfinished methamphetamine in
various stages of production.  Based on an estimated 431 gallons
of unfinished methamphetamine present and a yield output of 8
pounds of methamphetamine per gallon, investigators estimated
the unfinished methamphetamine present at the lab to be
approximately 3,448 pounds.  Investigators also located and
seized approximately 55 pounds of finished methamphetamine from
the residence at the Newberry Springs Property.  The total
weight of finished methamphetamine seized from the van and the
Newberry Springs Property was approximately 116.9 kg (or 257.7
pounds).

     41.  During a search of the residence, investigators
located and seized two ledger notebooks with pay/owe and expense
information in them.  Of particular interest, I later saw a page
with what appeared to be drug load delivery dates and amounts,
coded as "Rosas" or "Roses."  I saw an entry dated March 30,
2023 (the date of the buy/bust); 131 "Ramos"; "100 Rosas."
Based on my training and experience and in speaking with native
Spanish speaking law enforcement, I believe "Ramos" to be a term
possibly used for a methamphetamine production revolution, and

---

[10] Acetone is "listed chemical" for the purposes of Title
21, United States Code, Section 841(c)(1), which makes it a
felony punishable by a term of imprisonment for not more than 20
years for a person to possess a listed chemical with intent to
manufacture a controlled substance.

"Roses" to mean the amount of finished methamphetamine delivered to a buyer, where one "Rose" is equal to one pound of methamphetamine.  In this case, the entry dated March 30, 2023 involved the delivery of 100 "Roses" (pounds of methamphetamine) to a buyer.  I also believe that the pages with cost/expense information document the expenses incurred by the lab operators to keep the lab running, such as food, gasoline, and other supplies.  Also, the ledger has written inside what appears to be J. BOTELLO's email address of Juanbotello478@gmail.com.

42.  Investigators also found and photographed a medication bottle in one of the bedrooms and another one in the lab area both with labels bearing the name "Juan Luis Botello-Herrera."

43.  In the corner of one bedroom, investigators found two torn up Morongo Band of Mission Indians ("Morongo") exclusion notices.  Agents later pieced these together these notices and observed the name "Ochoa" (RUIZ's maternal surname) on one of them.  Morongo business records included complete exclusion notice and identifying information related to the subjects of those notices.  Morongo business records revealed that the one of the notices applied to "Julian Ruiz Ochoa," RUIZ.

**D.  Statement of Julian RUIZ-OCHOA**

44.  After his arrest in Moreno Valley, investigators transported RUIZ to the DEA Riverside District Office, where Detective Julian Enriquez conducted a *Mirandized* interview with him in Spanish.  During the interview, RUIZ stated that he lived in Perris, California and this was the first time he had transported narcotics.  He stated that he was contacted the

previous night by people he knew in Mexico asking for a favor, but could not identify who they where.  RUIZ reported he was to be paid $1,000 for this job.[11]

45.  RUIZ said he was given the truck (black Ford F-150), a phone, and a gun (loaded un-serialized 9mm handgun, seized by agents during his arrest), and told to drive to a hotel in Moreno Valley and meet with a pickup truck.

46.  RUIZ stated he did not know where the boxes came from and did not look in the boxes as they were sealed and were heavy, but he was aware he was committing a crime.  RUIZ stated he thinks someone was watching him at the meet and he was to call or send a message when he was done with the meeting.[12]

**E.   Statement of J. BOTELLO**

47.  Investigator A. Lopez conducted a field interview, in Spanish, of J. BOTELLO upon contacting him in the Dodge Transit van.  During the interview, J. BOTELLO stated he was coming from his house, but could not remember his address.  Investigator Lopez pointed at the mailbox he had seen J. BOTELLO check prior to being stopped, with the numbers "45950," and J. BOTELLO

---

[11] Per information provided to investigators by the CS, RUIZ had met with the CS on previous occasions at the Holiday Inn Express, Moreno Valley and sold to the CS large quantities of methamphetamine.

[12] Drug traffickers often notify co-conspirators once a large deal/delivery had been completed. In this case, I believe RUIZ intended to call or send a text message to J. BOTELLO or I. BOTELLO once the delivery was made to the CS, but because he was arrested the message was never sent.  I believe this lack of notification alerted J. and/or I. BOTELLO to RUIZ's arrest and that J. BOTELLO, I. BOTELLO, and SEGUNDO were attempting to flee the lab at the Newberry Springs Property with finished methamphetamine and precursor chemicals.  Investigators arrived on location in Newberry Springs just prior to their departure.

confirmed that was his house.  J. BOTELLO stated he had moved in about 15 days ago.

48.  Later, while at the scene, Investigator Lopez conducted a *Mirandized* interview of J. BOTELLO, and J. BOTELLO declined to answer further questions.

**F.   Statement of I. BOTELLO**

49.  Investigator Lopez conducted a field interview, in Spanish, of I. BOTELLO while he was detained outside the Newberry Springs Property.  During the interview, Investigator Lopez asked if there was anything illegal in the residence.  I. BOTELLO responded that inside the house was more of what was in the van.

50.  Investigator Enriquez later conducted a *Mirandized* interview of I. BOTELLO, and I. BOTELLO declined to answer further questions.

**G.   Statement of SEGUNDO**

51.  Investigator Enriquez conducted a *Mirandized* interviewed of SEGUNDO.  SEGUNDO stated that he did not live at the Newberry Springs Property, but came to visit his friend, Israel, and was given a ride to the residence.  SEGUNDO declined to answer any further questions without a lawyer.

**H.   Criminal History/Alienage for RUIZ**

52.  On March 31, 2023, I reviewed a criminal history rap sheet for RUIZ and learned that RUIZ was arrested on October 13, 2017 and charged with Sell/Furnish Marijuana, a felony violation of California Health and Safety Code § 11360, and granted

"arrest relief."  I observed no other previous charges on record.

53.  On April 7, 2023, I received information from Border Patrol agents that RUIZ is a Mexican citizen without legal status in the United States.  According to Border Patrol, his Employment Authorization Card issued on November 21, 2014 and expired on August 9, 2018.

**I.   Criminal History/Alienage for J. BOTELLO**

54.  On April 1, 2023, I reviewed a criminal history report for J. BOTELLO and learned that he was arrested on September 9, 2019, and charged with Alien Inadmissibility and subsequently deported to Mexico.  On May 6, 2022 he was arrested/cited for misdemeanor driving under the influence.  I observed no other previous charges on record.

55.  On April 7, 2023, I received information from Border Patrol agents that J. BOTELLO is a Mexican citizen without legal status in the United States.

**J.   Criminal History/Alienage for I. BOTELLO**

56.  On April 1, 2023, I reviewed a criminal history rap sheet for I. BOTELLO and learned that he has used the following two dates of birth on previous arrests: March 10, 1975 and March 10, 1985.  On January 13, 2013, he was arrested for Illegal Entry and convicted of a violation of Alien Inadmissibility on January 15, 2015.  He was sentenced to time served.  On January 29, 2014, he was arrested by and charged with Entry Without Inspection and convicted of Illegal Entry on January 31, 2014. He was sentenced to 30 days to serve and was deported to Mexico

on March 1, 2014.  On January 26, 2003, he was arrested for misdemeanor DUI-Alcohol/Drugs and was granted "arrest relief." I observed no other previous charges on record.

57.  On April 7, 2023, I received information from Border Patrol agents that I. BOTTELO is a Mexican citizen without legal status in the United States.

**K.   Criminal History/Alienage for SEGUNDO**

58.  On April 1, 2023, I reviewed a criminal history rap sheet for SEGUNDO and learned that on September 16, 2020, he was arrested and charged with Cult. Marijuana, 6+ plants / Poss. Marijuana for Sale in violation of Health and Safety Code Sections 11358 and 11359.  The criminal history report does not list a disposition for this offense, and I observed no other previous charges on record.

59.  On April 12, 2023. I received information from Border Patrol agents that SEGUNDO is a Mexican citizen with an expired Lawfully Admitted for Permanent Residence card.  He is a Mexican citizen without legal status in the United States.

**L.   Drug Test**

60.  The finished methamphetamine seized from RUIZ (approx. 49 kg/108 pounds) and from the Dodge van and Newberry Springs Residence (approx. 116 kg/257 pounds) was not field tested for safety reasons due to the rise in law enforcement contact with harmful substances such as fentanyl.  However, investigators observed both exhibits were packaged in one-pound increment amounts in Ziploc bags as methamphetamine is commonly packaged for transport/sale and had the appearance and consistency of

crystal methamphetamine.  The DEA Southwest Laboratory completed analysis of DEA Exhibit-1, the methamphetamine seized from RUIZ in Moreno Valley, concluding that the substance contains Methamphetamine Hydrochloride with an approximate purity level of 100% +/- 6% and included 44.8 kilograms of pure substance. The DEA Southwest Laboratory completed analysis of DEA Exhibit-2, the methamphetamine seized from the Dodge Transit van and the Newberry Springs Residence, concluding that the substance contains Methamphetamine Hydrochloride with an approximate purity level of 98% +/- 6% and included 108.7 kilograms of pure substance.  A sample of the unfinished methamphetamine inside the residence/lab was tested by lab-certified personnel and it tested positive for the presence of methamphetamine before being collected and disposed of by Patriot Environmental Services.

### V.  TRAINING AND EXPERIENCE ON DRUG OFFENSES

61.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.  Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.    Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

e.    Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VI. <u>TRAINING AND EXPERIENCE ON FIREARMS OFFENSES</u>

62. From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a. Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices. It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices.

b. Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c. Those who illegally possess firearms often sell their firearms and purchase firearms. Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. In my experience,

individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

d.    Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

### VII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

63.  As used herein, the term "digital device" includes the SUBJECT DEVICES.

64.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary

directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously

29

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

65.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

66.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical

feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress J. BOTELLO, I. BOTELLO, SEGUNDO, or RUIZ's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of J. BOTELLO, I. BOTELLO, SEGUNDO, or RUIZ's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

67.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VIII.   CONCLUSION

1.   For all of the reasons described above, there is probable cause to believe that J. BOTELLO, I. BOTELLO, and SEGUNDO have committed a violation of 21 U.S.C. § 846 (Conspiracy and Attempt to Distribute 50 Grams or More of Methamphetamine in Violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii)).   There is probable cause to believe RUIZ committed a violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii) (Possession with Intent to Distribute 50 Grams or More of Methamphetamine) and 18 U.S.C. § 924(c)(1) (Possession of a Firearm in furtherance of a Drug Trafficking Crime).   There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this <u>1st</u> day of
<u>May</u>, 2023.

_____
UNITED STATES MAGISTRATE JUDGE